**Janet L. ACKER, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**Nos. 213–78C, 399–78C, 76–79C, 266–79C, 580–79C, 57–80C, and 543–82C.**

United States Court of Federal Claims.

Sept. 9, 1993.

Stuart R. Wolk, Montville, NJ, for plaintiffs. Arthur E. Neuman, Washington, DC, of counsel.

John W. Showalter, Asst. Director, with whom were Asst. Atty. Gen. Frank W. Hunger and David M. Cohen, Director, Washington, DC, for defendant.

## OPINION

ANDEWELT, Judge.

In these consolidated civilian pay actions, the nine remaining plaintiffs,[1] teachers presently or formerly employed by the Department of Defense Overseas Dependents School System (DODDS), seek living quarters allowances (LQA) and associated benefits. Plaintiffs' claims have been the subject of three prior decisions. *Acker v. United States*, 223 Ct.Cl. 281, 620 F.2d 802 (1980) (*Acker I*); *Acker v. United States*, 6 Cl.Ct. 503 (1984) (*Acker II*); *Acker v. United States*, 23 Cl.Ct. 803 (1991) (*Acker III*). Presently before the court are the parties' cross-motions for summary judgment. In its briefs and at oral argument, defendant requested that the court initially restrict its ruling herein to the narrow issue of whether a teacher's transfer pursuant to an official DODDS transfer program is, in and of itself, sufficient grounds under the pertinent regulations to entitle that teacher to LQA and associated benefits. Plaintiffs have not objected to this request. The court generally will follow defendant's proposed approach, but, in an effort to facilitate negotiations toward settlement of the remaining claims, the court also will discuss one other issue—its interpretation of *Bentley v. United States*, 3 Cl.Ct. 403 (1983), and a companion case, *McAllister v. United States*, 3 Cl.Ct. 394 (1983).

### I.

As explained in *Acker I*, 223 Ct.Cl. at 284–85, 620 F.2d at 803, Congress authorized the President to promulgate regulations defining eligibility for LQA and associated benefits, and in turn, the President delegated this authority to the Secretary of State. The Secretary of State issued the Department of State Standardized Regulations (DOSSR) which were adopted by the Department of Defense in Directive No. 1400.13. DOSSR § 031 provides that "the head of an agency may defray official residence expenses for, and grant post differential, quarters, cost-of-living, and representation allowances to employees of his/her agency ... subject to the provisions of these regulations." Plaintiffs seek benefits under DOSSR § 031.12(c). DOSSR § 031.12 provides, in pertinent part:

> Quarters allowances ... may be granted to employees recruited outside the United States, provided that ...
>
> c. as a condition of employment by a Government agency, the employee was required by that agency to move to another area, in cases specifically authorized by the head of agency.[2]

In *Trifunovich v. United States*, 196 Ct. Cl. 301, 305, 311, 1971 WL 17830 (1971), the Court of Claims concluded that notwithstanding the DOSSR's discretionary wording with respect to the award of the disputed benefits (*e.g.*, "Quarters allowances ... may be granted"), an agency is obliged to grant such benefits where its interpretation of the DOSSR is erroneous and the claimant has satisfied the requirements specified in the regulation. Based on this binding precedent, plaintiffs herein are entitled to LQA and associated benefits if they can demonstrate that they satisfied the requirements contained in DOSSR § 031.12(c).

### II.

■ The plain language of DOSSR § 031.12(c) creates two requirements for entitlement to LQA: (1) an employee must have been "required" by his or her employing agency to move to another area; and (2) this requirement to transfer must have been a "condition of employment" with the agency. Consistent with these require-

---

1. These consolidated actions originally involved several hundred plaintiffs. All but the remaining nine plaintiffs have either settled or voluntarily dismissed their actions.

2. Prior to 1971, when defendant repealed the so-called "student/tourist" basis for an award of the benefits here in dispute and made other changes to the regulations, subsection (c) was denoted as subsection (e).

ments, DOSSR § 031.12(c) does not anticipate the grant of LQA where a transfer results from an employee's voluntary request rather than an agency requirement, or where an employee's continued service with an agency is not conditioned[3] upon the employee accepting a transfer.[4]

The Department of Defense promulgated instructions for implementing DOSSR § 031.12(c). The controlling instruction at the time of the transfers here in dispute was Department of Defense Instruction (DODI) No. 1418.1, Section III(B)(1)(d), which provided:

> [DOSSR §] 031.12(c) ... will be applied only when an employee is relocated (Permanent Change of Station) to another area by a management-generated action. In all other situations, this provision will not be applied unless it is established that management has no other alternative but to request an employee not now eligible for [LQA] to relocate to another area.[5]

### III.

Each of the remaining plaintiffs herein were transferred one or more times under an official DODDS transfer program. Plaintiffs contend that the structure, operation, and purpose of these various transfer programs were such that each transfer thereunder necessarily must be classified as a "management-generated" transfer which entitles the teacher to LQA and associated benefits. Because the parties agree that all of these DODDS transfer programs had the same pertinent characteristics, the court will discuss only one, the Development Reassignment Program (DRP), under which the majority of the disputed transfers occurred.

Contrary to plaintiffs' contentions, the evidence submitted by the parties demands the conclusion that a transfer pursuant to the DRP does not in an of itself produce an entitlement to LQA and associated benefits. Rather, the evidence indicates that generally the transfers pursuant to the DRP were voluntary in nature and a teacher's continued employment with DODDS was not conditioned upon the teacher accepting a transfer.

The record indicates that the DRP operated as follows. To help determine staffing requirements at DODDS schools, DODDS required teachers each year to fill out a "Declaration of Intent."[6] The "Declaration of Intent" requested the teachers to state their intentions for the next school year, *i.e.*, whether they intended to resign, remain at their present duty station, request reassignment within their present school or school complex, or request reassignment under the DRP.[7] If a teacher

---

**3.** A "condition" is "[a] future and uncertain event upon the happening of which is made to depend on the existence of an obligation...." *Black's Law Dictionary* 293 (6th ed. 1990).

**4.** During oral argument, plaintiffs admitted that under DOSSR § 031.12(c), a teacher is entitled to LQA and associated benefits only where the teacher has no choice but to accept the offer of transfer or risk the loss of his or her teaching position.

**5.** Chapter 592 of the Department of Defense Civilian Personnel Manual (CPM), No. 1400.25–M, effective January 1, 1982, replaced DODI No. 1418.1. Subchapter 2, Section 2–2(b)(6) of CPM 592 defines the phrase "a condition of employment" as a condition that "if not fulfilled, results in failure to gain or retain employment." Section 2–2(b)(6) also provides that the appropriate "Major Command" or delegated official of such command should apply the following tests when determining whether to award LQA:

1. Will employment be ended if the employee fails to accept relocation? If the answer is yes,
2. Is the relocation caused by management-generated action such as reduction in force or a transfer of function? If the answer is no,
3. Must management request an employee not now eligible for the LQA to relocate to another area? For example, was management unable to recruit a new employee or unable to recruit an employee currently with LQA eligibility to accept relocation?

**6.** This declaration was previously referred to as an "Annual Decision Statement."

**7.** Only "full-time, non-time-limited (permanent) educator personnel, General Schedule (GS), or Public Law 86–91" could apply for participation in the DRP. Additionally, to be eligible for participation in the DRP, teachers had to have completed two or more successive full school years at their current permanent duty station regardless of geographic location, or one or

requested reassignment under the DRP, DODDS required that teacher to provide additional information, including a list of locations, in order of preference, of three schools, cities, or countries to which the teacher desired reassignment. If DODDS offered the teacher a position at one of the locations the teacher had requested, the teacher had the option of either accepting or declining the position.[8] According to DODDS publications, the only penalty for a teacher denying an offer of reassignment was that the teacher would not receive further consideration for other reassignments during the school year to which the "Decision of Intent" pertained.

Apparently, under the DRP the only time a teacher's continued employment with DODDS was potentially placed at risk was when a teacher accepted an offer of reassignment and later reneged and refused to report to his or her new position. However, the possibility that a teacher could be separated from service for failure to fulfill a commitment to transfer would not seem sufficient in and of itself to entitle any of the plaintiffs herein to LQA and associated benefits. First, there is no indication that DODDS required any plaintiff to move to an area to which the plaintiff did not desire reassignment. Plaintiffs' transfers apparently were completely voluntary and based on plaintiffs' requests for reassignment under the DRP and similar programs; there is no indication that any plaintiff had changed his or her mind about reassignment but nevertheless agreed to transfer out of fear of being dismissed for reneging on a prior acceptance.

Second, even if certain plaintiffs had changed their minds about reassignment and had reported to their new positions solely out of fear of being separated from service, it still would not seem appropriate for purposes of DOSSR § 031.12(c) and DODI No. 1418.1 to characterize such transfers as "management-generated" transfers "required" by DODDS "as a condition of employment." ·Given the essentially voluntary nature of the DRP transfer application process, it would seem appropriate to characterize any reassignment thereunder as having been "generated" by a teacher's voluntary enrollment in the DRP and voluntary acceptance of an offer of transfer, rather than a requirement of DODDS. It is correct that a teacher's acceptance of such reassignment would create a new "condition of employment" in that the teacher would then be vulnerable to separation from service if he or she later reneged on his or her voluntary commitment to report to a new position. This "condition," however, seems quite different from the "condition" addressed in DOSSR § 031.12(c), which, as explained above, is directed at situations where an agency requires an employee to transfer rather than where an agency grants an employee's transfer request. Hence, under the DRP, the pertinent "condition of employment" is that a teacher fulfill his or her voluntary commitment to transfer, rather than that the teacher acquiesce to a management-generated requirement that the teacher transfer to a specific location.

## IV.

Next, plaintiffs focus on the phrase "management-generated action" as used in DODI No. 1418.1 and contend that the transfers herein necessarily were "management-generated action[s]" because DODDS benefitted from these transfers in that these transferred teachers filled open positions which otherwise may have been difficult to fill. To support this argument,

more successive school years in any one of 21 specific geographic locations. Teachers were ineligible for participation in the DRP if they indicated on their "Declaration of Intent" that they intended to resign, remain at their present duty station, or request reassignment to the "Atlantic or Pacific Areas."

8. If the teacher accepted a transfer, DODDS reserved the right to assign that teacher to a "position" that could differ somewhat from the "position" DODDS had initially offered. The term "position," however, apparently referred to a particular job to be performed at the location and not to the location itself. In any event, plaintiffs herein do not present any evidence that any plaintiff, after accepting a transfer, was assigned to a different location than the location to which he or she originally agreed to be reassigned.

plaintiffs refer to DODDS documents that stated that transfers under the DRP were based on the needs of management and not on the personal needs or desires of the individual teachers.[9] However, an interpretation of DODI No. 1418.1 that focuses exclusively on whether DODDS accrued benefits would ignore the express limitation in DOSSR § 031.12(c) that LQA be awarded only where a teacher's "move to another area" is "required" as a "condition of employment." Indeed, plaintiffs' proposed interpretation would result in every DODDS transferee qualifying for LQA and related benefits because, as should not be surprising, DODDS documents indicated that DODDS transferred teachers only to schools where there were available positions and, hence, there was some need.

In addition, plaintiffs' proposed interpretation would render superfluous the third sentence in DODI No. 1418.1, Section III(B)(1)(d). The second sentence refers to "management-generated action[s]" and the third sentence provides: "In all other situations, [DOSSR § 031.12(c)] will not be applied unless it is established that management has no other alternative but to request an employee not now eligible for [LQA] to relocate to another area." If the phrase "management-generated action" was so broad as to encompass all transfers that benefitted DODDS, then all transfers would come within the scope of the second sentence in DODI No. 1418.1, Section III(B)(1)(d), and the third sentence would thus be superfluous.

Plaintiffs' proposed interpretation of "management-generated action" as encompassing all transfers that benefit DODDS also is inconsistent with DODDS's own historical interpretation of the phrase. In a

1976 letter explaining DODDS's denial of LQA to a former plaintiff in this action who had transferred schools under the DRP, the Director of DODDS defined the phrase "management-generated action" as follows:

> [A] 'management-generated action' which results in granting a locally hired employee [LQA], is essentially an action in which management has little, if any, options in determining who will fill a specific position. Such a situation may occur when there is a reduction in force or transfer of function. It may also occur, in rare instances, when management determines a specific position can be filled only by one specific person.

## V.

In an attempt to support their position that DODDS required transfers under the DRP as a "condition of employment," plaintiffs cite a Federal Labor Relations Authority (FLRA) decision that affirmed an arbitrator's decision to award LQA and related benefits to DODDS teachers based on the teachers transfers to different DODDS schools under the Inter–Regional Transfer Program. *DODDS v. Overseas Federation of Teachers*, 36 F.L.R.A. 861, 1990 WL 155350 (1990). This court, however, finds the points made by the arbitrator and the FLRA either unconvincing or inapplicable here. This court already has rejected certain of the arguments the FLRA found compelling. One argument the court has not yet addressed is the arbitrator's conclusion that DODDS's unfettered right to initiate involuntary transfers was a "bayonet[ ] lurking in the shadows of the [transfer] program."[10] Contrary to this characteriza-

---

9. For example, one DODDS document stated that "reassignments [under the DRP] will not be based upon personal reasons, dislike of the weather, facilities or fellow employees, nor a desire to be with friends or relatives" but rather upon "the needs of the school program."

10. To support the conclusion that a transfer under a DODDS transfer program is not voluntary and thus entitles a teacher to LQA and associated benefits, the arbitrator quoted the following statement contained in a 1984 DODDS "Personnel Guide for Public Law 86–91 Edu-

cators" which discusses reassignments pursuant to a DODDS transfer program:

> The fact that an educator has indicated availability for reassignment by participation in the program does not mean that the reassignment was made at the request of the educator. The determining factor is whether or not the reassignment was made for the benefit of the Government.

But 1984 is subsequent to the transfers in issue here. Moreover, when the above-quoted statement is examined in the context of the full

tion, however, plaintiffs have not submitted any evidence indicating that plaintiffs personally requested a transfer because they were faced with the threat of involuntary reassignment.[11] Moreover, even if there had been such a threat of involuntary reassignment, reassignment is not equivalent to termination of employment and, hence, any such transfer should not be deemed to have been required as a "condition of employment."

■ Next, plaintiffs allege that DODDS strongly encouraged certain plaintiffs to enter the DRP by explaining that a transfer could improve a teacher's chances both for advancement within DODDS and of maintaining his or her position in the event of a school closure. DODDS's advice and encouragement with regard to joining the DRP, however, may well have been sound in that experience at a variety of schools in different geographic locations could improve a teacher's skills and render that teacher more worthy of promotion. In any event, any such advice and encouragement would not create an entitlement to benefits under the controlling language of the applicable regulations. Even if seeking and accepting a transfer was a condition for a teacher's advancement and promotion, this would not make such action a condition of continued employment. As explained above, DOSSR § 031.12(c) does not apply unless accepting reassignment to a position in another area was a condition of continued employment with DODDS.

It certainly is at least possible that certain DODDS supervisors threatened to dismiss certain teachers if they did not participate in the DRP, but there is no evidence that the DRP was structured to permit such abuse or that any of the plaintiffs herein faced such a threat. The court has reviewed the individual claims submitted by plaintiffs and none of these claims indicates that DODDS transferred any plaintiff to a position the plaintiff did not desire and to which the plaintiff did not want to be transferred. Thus, there is no suggestion that DODDS required plaintiffs to accept a transfer as a "condition of employment."

## VI.

■ Plaintiffs allege that DODDS changed its position after initially indicating to four of the nine remaining plaintiffs that those plaintiffs would receive the benefits in dispute. During oral argument and in their supplemental briefs, plaintiffs cited *Bentley* and *McAllister* for the proposition that DODDS could not properly reverse its initial position to grant the disputed benefits. For purposes of facilitating negotiations between the parties, the court will briefly discuss its interpretation of this precedent.

Like the instant case, *Bentley* and *McAllister* address a teacher's entitlement to LQA and related benefits under applicable regulations. The regulation in issue in

---

paragraph in which the statement appears, it is clear that the quoted statement deals with a teacher's right to be reimbursed for travel and transportation expenses under 5 U.S.C. § 5724(h). There is no suggestion in the Personnel Guide that reassignment for the benefit of the government also should be the determining factor with respect to an entitlement to LQA and associated benefits.

11. Plaintiff Karen A. Hurst presents an affidavit from Karen L. O'Brock, a DODDS employee, in which O'Brock asserts that "[a]ll teachers *must* participate and respond to the [DRP]" (emphasis in original) and that "[f]ailure to cooperate in the [DRP] is grounds for dismissal, termination, or nonavailability of a position within the DODDS." But O'Brock did not provide any factual basis to support her conclusion and did not explain her use of the phrase "failure to cooper-

ate." O'Brock may have merely been referring to the obligation to complete the "Declaration of Intent." In the alternative, O'Brock may have been referring to the possibility of dismissal as discussed above, where a teacher reneges on a previous commitment to transfer. But as explained above, this court concludes that the possibility of such a sanction is not sufficient to support plaintiffs' claims herein. Upon review, O'Brock's conclusory affidavit is simply not sufficient to support a factual conclusion that any of the plaintiffs herein were required to accept transfers as a condition of their further employment with DODDS. Therefore, this affidavit is insufficient to demonstrate the existence of a dispute as to a material issue of fact and, hence, is insufficient to defeat a properly supported motion for summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

*Bentley* and *McAllister* (Joint Travel Regulation C4108) permitted DODDS to grant a teacher LQA and related benefits in specified circumstances where a teacher transferred from one school to another within the same city or geographic area. The regulation required DODDS to weigh and consider a variety of factors and gave the agency decision-maker "considerable latitude in determining eligibility." *Bentley*, 3 Cl.Ct. at 407.[12] In each case, DODDS initially awarded benefits and later sought to change its position. In each case, however, the court prevented DODDS from reversing its earlier decision. Both courts stressed that agencies generally are free to correct erroneous grants of entitlements, *id.* at 406, *McAllister*, 3 Cl.Ct. at 398, but held that on the particular facts of each case, DODDS had failed to demonstrate that its original award of benefits had been erroneous. Specifically, in each case, the court determined that DODDS was unable to establish that when the agency decision-maker originally granted the benefits, the decision-maker had abused his or her broad discretion.

Turning to the instant case, *Bentley* and *McAllister* serve to reiterate the general rule[13] that even if plaintiffs herein had accepted reassignment in reliance upon DODDS's original decision to grant LQA and related benefits, DODDS still could reverse its position if that original decision to grant those benefits had been erroneous. Therefore, assuming that DODDS had initially granted benefits to four of the nine remaining plaintiffs, the task before the court would be to make an assessment, on a case-by-case basis, as to whether that original decision was erroneous.

The evidence presented thus far suggests that any initial decision to grant LQA and related benefits was erroneous. Unlike the regulation at issue in *Bentley* and *McAllister*, application of DOSSR § 031.-12(c) does not involve the DODDS decision-maker exercising broad discretion by balancing a variety of factors. Rather, DOSSR § 031.12(c) requires resolution of a narrow factual question, *i.e.*, whether DODDS required the teacher to transfer to another geographic area as a condition of employment. Herein, plaintiffs apparently base their claim to eligibility for LQA and related benefits on their having participated in the DRP. However, as discussed above, the DRP generally was voluntary in nature and a transfer thereunder does not produce an automatic entitlement to the benefits in dispute. Consistent with that analysis, to the extent DODDS based its initial decision to grant LQA and related benefits to a plaintiff exclusively on the fact that that plaintiff was transferred under the DRP, that decision would have been erroneous, and thus, DODDS properly could reverse its decision.

### Conclusion

For the reasons set forth above, the fact that plaintiffs were transferred under DODDS transfer programs does not itself entitle plaintiffs to LQA and associated benefits under DOSSR § 031.12(c) and DODI No. 1418.1. Therefore, to that extent, defendant's motion for summary judgment is granted and plaintiffs' cross-motion is denied. The parties shall seek to resolve all remaining issues. If the parties cannot reach a mutually acceptable resolution, on or before October 12, 1993, the parties shall file a status report, jointly or separately, explaining which issues remain open for court resolution and proposing scheduling for the efficient resolution of those issues.

IT IS SO ORDERED.

---

12. In essence, the decision-maker could grant such benefits if the transfer resulted in a commute that was unreasonable.

13. *See, e.g., Bookman v. United States*, 197 Ct.Cl. 108, 111, 453 F.2d 1263, 1265 (1972); *Dillon v. United States*, 229 Ct.Cl. 631, 635, 1981 WL 22084 (1981).